**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO, DIVISION**

-------------------------------- :

| | |
|---|---|
| **SALOOJAS INC,** | : **CASE NO: 22-CV-01696-JSC** |
| **Plaintiff** | : **OPPOSITION TO DEFENDANT'S** |
| | : **MOTION TO DISMISS** |
| **vs.** | : |
| | : |
| **AETNA HEALTH OF CALIFORNIA, INC** | : U.S. Magistrate Judge Jacqueline Corley |
| | : Date: April 28. 2022 |
| **Defendant.** | : Time: 9:00 A.M. |
| | : Location: Courtroom E, 15th Fl |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION**

**TO DEFENDANT'S MOTION TO DISMISS**

**LAW OFFICE OF MICHAEL LYNN GABRIEL**
**MICHAEL LYNN GABRIEL**
**CA Bar 86924**
**Attorney for Plaintiff**
**1563 Stevenson Blvd**
**Newark, CA 94560**
**650-888-9189**
**510-656-5700**
**aetal@earthlink.net**
**migabriel@saloojasinc.com**

## TABLE OF CONTENTS


Page(s)

I. INTRODUCTION 5

II. STATEMENT OF RELEVANT FACTS

A. The Parties 7

B. The CARES ACT 7

C. To Combat The National Pandemic, The Plaintiff Practice Created Testing Sites At The Very Start Of The Pandemic 9

D. Due To The Need For Immediate And Efficient Testing, Congress Enacted The FFCRA And CARES Act So Patients Could Get Easily Get Tested And Providers Would Be Fairly Compensated During The National Pandemic 9

III. LEGAL STANDARD 11

IV. ARGUMENT 11

A. The Plaintiff Has An Implied Private Right Of Action Under Both The FFCRA And The CARES Act 11

B. A Private Right of Action Exists under the CARES Act. 15

CONCLUSION 19

**TABLE OF AUTHORITIES**

**Page(s)**

***Am. Video Duplicating, Inc. v. City Nat'l Bank*,**
**No. 20-cv-04036, 2020 WL 6882735 (C.D. Cal. Nov. 20, 2020)..............................15**

***Alexander v. Sandoval***
***532 US 275, 290* ………………………………………………………………….14**

***Cort v. Ash*,**
**422 U.S. 66 (1975)..........................................................................................................12**

***Diagnostic Affiliates of Northeast Houston, LLC vs. United HealthCares Services,***
**Jan 19, 2022, Civ Act ……………………………………...………...………16**

***Franklin v. Gwinnett County Pub. Schs.*,**
**503 U.S. 60 (1992)..........................................................................................................13**

***Lindsay v. Ass'n of Prof'l Flight Attendants*,**
**581 F.3d 47 (2d Cir. 2009).............................................................................................12**

***Maine Comm Health v US Mod Health Plan***
**140 S.CT 1320 (2020)....................................................................................................16**

***M.F. v. State of New York Exec. Dep't Div. of Parole*,**
**640 F.3d 491 (2d Cir. 2011)...........................................................................................18**

***Murphy Med.Asso, LLC vs Cigna Health & Life Ins. Co***
**2022 U.S. Dist. LEXIS 43351 ……………………………………...…………..16**

***Oxford Univ. Bank v. Lansuppe Feeder, LLC*,**
**933 F.3d 99 (2d Cir. 2019).............................................................................................14**

***Patane v. Clark*,**
**508 F.3d 106, 111 (2d Cir. 2007)...........................................................................11**

***Republic of Iraq v. ABB AG*,**
**768 F.3d 145 (2d Cir. 2014)...........................................................................................12**

***Touche Ross & Co. v. Redington*,**
**442 U.S. 560, 575–76 (1979) .......................................................................................17**

***Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*,**
**444 U.S. 11, 15 (1979) .................................................................................................13**

***Villager Pond, Inc. v. Town of Darien*,**
**56 F.3d 375, 378 (2d Cir. 1995)..........11**

**Statutes**

**Coronavirus Aid, Relief, and Economic Security Act (CARES Act) Act, Pub. L. No. 116-136, 134 Stat. 281 (March 27, 2020)……...7**

**Families First Coronavirus Response Act ("FFCRA"), Public Law 116-127, 134 Stat. 178 (March 18, 2020……..5**

**FRCP Rule 12(b)(6)..........11**

Plaintiff Saloojas, Inc, dba AFC Urgent care of Newark, submits this Memorandum of Law in Opposition to Defendant Aetna Healthcare of California's Motion to Dismiss.

## I. INTRODUCTION

In late March of 2020, America's worst pandemic in over 100 years, the COVID-19 outbreak, was ravaging the country. In response, the United States Congress and the President of the United States agreed that immediate and drastic action was necessary. Because the disease was easily spread by an infected person, even before symptoms developed, any effort to contain the disease required testing as many Americans as possible to identify the infected to provide prompt treatment. Further, rapid testing was needed so that infected people would quarantine themselves and not infect others with the highly communicable disease. In pursuit of this goal, the Government took the extraordinary step of enacting a pair of statutes to reduce the pandemic's harm by ensuring that any person who needed a test could get one.

Congress addressed both of these concerns in the Families First Coronavirus Response Act ("FFCRA") and the CARES Act. Taken together, these statutes required all health insurance plans to cover COVID-19 testing with no out of pocket expenses to patients. The acts sought to make certain that no person would have to consider the economic cost of getting tested, and so co-payments, deductibles, and co-insurance were prohibited. But removing barriers that might discourage patients from getting tested was only part of the goal – Congress also needed to persuade practitioners to participate and invest in establishing testing centers that would test anyone. This included making sure that providers would not turn away patients who had insurance coverage, but the coverage was through a plan in which the provider was not a contracted participant, *i.e.,* was "out-of-network." So Congress addressed both in-network and out-of-network providers

directly, requiring plans to cover testing from out-of-network providers on the same terms as from in-network providers: no out of pocket expenses, no co-payments, no deductibles.

Congress recognized, however, that plans often pay very little to out-of-network providers, something they do to incentivize their members to use in-network providers who have agreed by contract to accept discounted rates. In order to prevent providers from declining to provide testing services to patients who were out-of-network with respect to the providers, Congress set out a specific reimbursement protocol for out-of-network providers: plans were required to pay them their cash price, unless a lower negotiated price was agreed to.

Dr. Parmjit Singh and the Plaintiff were among the earliest pioneers in the effort, establishing testing centers and providing around the clock opportunities for residents of Northern California to protect themselves and their families by getting tested. Dr. Singh's efforts, included testing over 35,000 patients and providing no-cost testing to over 3,000 uninsured patients, was hailed by local leaders such as the Mayor of Newark, California.

In its response to the national emergency, Aetna did not embrace the coordinated approach to testing developed by Congress. Rather, Aetna looked to protect their bottom line and engaged in a campaign to undermine and circumvent federal policy and federal law as reflected in the FFCRA and the CARES act, as well as the guidance issued by federal agencies. Aetna has routinely refused to honor its coverage obligations under the federal legislation and has instead repeatedly refused to pay providers, like the Plaintiff for services federal law requires Aetna to reimburse.

Most shocking, however, is that when challenged, Aetna's response is essentially, "tough luck – there is nothing you can do about it." In this action, Aetna actually makes the argument that even if federal law requires them to reimburse the Plainitff for testing

and related services (which it undoubtedly does), and even if Aetna wrongfully refused to reimburse the Plaintiff for the testing services provided to Aetna members (which they undoubtedly did), there is nothing that can be done. In essence, Aetna contends that they are entitled to treat a binding federal statute as an option, something they can comply with or not as they see fit, but something that there is little or no consequence for disobeying and that this is precisely what Congress wanted.

The Plaintiff brings this action to hold Aetna responsible for their not only illegal and irresponsible response to the pandemic and to federal efforts to combat it, but for the sheer arrogance of their assertion that Aetna is above the law.

## II. STATEMENT OF RELEVANT FACTS

### A. The Parties

Plaintiff Saloojas, Inc, is a corporation organized under California law. The mission of the Plaintiff is to provide high-quality preventive and general health services, as well as acute primary care, to men, women, and adolescents. The Plaintiff accomplishes its mission by offering various Covid preventive medical services.

Defendant Aetna Healthcare of California, Inc. is a California corporation.

### B. The CARES ACT

Congress in early 2020 when the COVID pandemic was just starting wanted to be sure that all Americans had access to COVID Testing Services. Congress passed the federal Cares Act Covid testing provisions, which are set forth below:

SEC. 6001. COVERAGE OF TESTING FOR COVID–19.

(a) IN GENERAL.—A group health plan and a health insurance issuer offering group or individual health insurance coverage . . . ***shall provide coverage, and shall not impose any cost sharing (including***

> ***deductibles, copayments, and coinsurance) requirements or prior authorization or.other medical management requirements***, for the following items and services furnished during any portion of the emergency period beginning on or after the date of the enactment of this Act:
>
> (1) In vitro diagnostic products. . . for the detection of SARS–CoV–2 or the diagnosis of the virus that causes COVID–19 that are approved, cleared, or authorized and the administration of such in vitro diagnostic products.
> (emphasis added).

The CARES Act then states:

> SEC. 3202. PRICING OF DIAGNOSTIC TESTING.
>
> (a) REIMBURSEMENT RATES.—A group health plan or a health insurance issuer providing coverage of items and services described in section 6001(a) of division F of the Families First Coronavirus Response Act (Public Law 116–127) with respect to an enrollee ***shall reimburse the provider*** of the diagnostic testing ***as follows***:
>
> (1) If the health plan or issuer has a negotiated rate with such provider in effect before the public health emergency declared under section 319 of the Public Health Service Act (42 U.S.C. 247d), such negotiated rate shall apply throughout the period of such declaration.
>
> (2) If the health plan or issuer does not have a negotiated rate with such provider, such plan or issuer ***shall reimburse the provider in an amount that equals the cash price for such service as listed by the provider on a public internet website,*** or such plan or issuer may negotiate a rate with such provider for less than such cash price.
>
> (b) REQUIREMENT TO PUBLICIZE CASH PRICE FOR DIAGNOSTIC TESTING FOR COVID–19.—
>
> (1) IN GENERAL.—During the emergency period declared under section 319 of the Public Health Service Act (42 U.S.C. 247d), each provider of a diagnostic test for COVID–19 shall make public the cash price for such test on a public internet website of such provider

Since the passage of the CARES ACT , 971,162 have died of Covid in the United States almost 1 out of every 350 people have died because of Covid, 86,794 have died in California of Covid and 2,243 have died of Covid in Alameda county alone.

**C. To Combat The National Pandemic, The Plaintiff Created Testing Sites At The Very Start Of The Pandemic**

In early 2020 the COVID-19 pandemic quickly set upon the United States. Due to the hyperbolic onset of COVID-19, California, and the rest of the country, were unprepared in many critical aspects.

One glaring issue was the lack of COVID-19 testing. Dr. Singh was one of the first to assist in the fight against COVID-19 and assist the people of Northern California to address the desperate need for timely COVID-19 testing.

Not surprisingly, this drastic and immediate change required that the Plaintiff invest hundreds of thousands of dollars to transform its traditional medical practice to set up COVID-19 testing site for walk in patients. These sites – which were erected virtually overnight – were designed to provide efficient drive and/or walk-through COVID-19 testing to patients with symptoms or suspected exposure. This was the first line of defense against the pandemic. The Plaintiff operated drive and/or walk-through COVID-19 testing site in Newark, California.

In addition to creating the physical infrastructure for the testing sites, the Plaintiff had to assemble the clinical and administrative staff needed to operate the sites. Similarly, it had to develop extensive protocols and procedures to ensure the sites were effectively and efficiently operating, and that all safety, infection control, OSHA, and CDC guidance were observed. Dr. Singh and his efforts to drastically increase testing in the area were a key and valuable part of the population's defenses against COVID-19.

**D. Due To The Need For Immediate And Efficient Testing, Congress Enacted The FFCRA And CARES Act So Patients Could Get Easily Get Tested And Providers Would Be Fairly Compensated During The National Pandemic**

On January 31, 2020, a public health emergency was declared. Unprepared to fight the COVID-19 pandemic, Congress enacted legislation to help the country fight the virus. Congress has allowed patients to have access to a COVID-19 test that was provided by a practice that was not in the patient's insurance network. The FFCRA and the CARES Act apply to COVID-19 testing, antibody testing, and related services rendered by both "in-network" and "out-of-network" providers (those who don't have a contractual relationship with the insurer). This was done despite the usual practice that insurers seek to dissuade their members from using "out-of-network" providers, as a cost saving measure.

Both the FFCRA and the CARES Act addressed how insurers were required to reimburse both "in-network" and "out-of-network providers." In a section titled "ACCESS TO HEALTH CARE FOR COVID-19 PATIENTS," the CARES Act added a requirement that health plans covered by the FFCRA "**shall reimburse the provider of the diagnostic testing as follows . . .**" for covered tests and services. The Act then set forth alternative methods to calculate the actual payment amounts health plans were required to pay providers for testing and other services. Importantly, the Act addressed payment for services provided by "out-of-network" providers and "in-network" providers.

To be more precise, under the legislation, if the patient's plan already had a negotiated rate with the provider, *i.e.*, the provider was "in-network," the plan had to pay that negotiated rate. Furthermore, the Act also addressed the payment requirements for providers who did not have a negotiated rate, *i.e.,* "out-of-network providers." Insurers must pay "out of network" providers their full cash price for the test unless the insurer can negotiate a lower rate with the provider. In addition to reimbursing providers for the COVID tests, insurers must reimburse providers for other related tests, items, and services furnished during a visit that results in an order for a COVID-19 or COVID-19 antibody

test. Aetna's refusal to pay for rendered COVID testing services are expressly prohibited.

Although a few payments have been made, as of now, the amount owed to the Plaintiff for its rendered covid testing services Aetna still owes more than $1 million dollars. Aetna has denied reimbursement for COVID-19 testing and testing-related services for thousands of Aetna's members or beneficiaries.

## II. LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) must be decided on "facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken." *Leonard F. v. Israel Disc.* Bank of N.Y., 199 F.3d 99, 107 (2d Cir. 1999). In deciding a motion to dismiss, well-pleaded facts must be accepted as true and considered in the light most favorable to the Plaintiff. *Patane v. Clark,* 508 F.3d 106, 111 (2d Cir. 2007). The issue in deciding a motion to dismiss is "not whether the plaintiff will ultimately prevail but whether the plaintiff is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir. 1995).

## III. ARGUMENT

### A. The Plainitff Has An Implied Private Right Of Action Under Both The FFCRA And The CARES Act

In their Motion, Aetna attempts to circumvent federal law by arguing that there is no private right of action under the FFCRA or the CARES Act, requiring dismissal of Plaintiff's Complaint In fact, a private right of action can readily be inferred from the language and context of the FFCRA and the CARES Act establishing the Plaintiff's right to reimbursement for the COVID testing services it provided.

The question of whether a federal statute contains an implied private right of action is "basically a matter of statutory construction." *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 15 (1979). The Supreme Court has enumerated several factors that are relevant to this analysis, including:

(1) whether the plaintiff is "one of the class for whose especial benefit the statute was enacted";

(2) whether there is "any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one";

(3) whether a private right of action is "consistent with the underlying purposes of the legislative scheme"; and

(4) whether "the cause of action [is] one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law." *Cort v. Ash*, 422 U.S. 66, 78 (1975); *Republic of Iraq v. ABB AG*, 768 F.3d 145, 170 (2d Cir. 2014) ("To 'illuminate' this analysis, we also consider factors enumerated in *Cort v. Ash*") (internal citation omitted)); *see also M.F. v. State of New York Exec. Dep't Div. of Parole*, 640 F.3d 491, 495 (2d Cir. 2011) (courts in the Second Circuit continue to apply the factors set forth in *Cort* in order to discern congressional intent to provide a private right of action); *Lindsay v. Ass'n of Prof'l Flight Attendants*, 581 F.3d 47, 52 n.3 (2d Cir. 2009) (same).

The FFCRA and the CARES Act plainly create a benefit for the class of persons of which the Plaintiff is a member: out-of-network providers who furnish COVID testing. The statute straightforwardly directs insurers like Aetna to pay out-of-network providers who furnish COVID-19 testing. Importantly, the statutes go further, describing how the amount such providers must be paid will be calculated. It states that "such plan or issuer shall

reimburse the provider in an amount that equals the cash price for such service as listed by the provider on a public internet website . . ." This provision "grant[s] private rights to members of an identifiable class." *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. at 24. Unlike the provision found insufficient to create a private right of action in *Transamerica*, this one "create[s] or alter[s] any civil liabilities." *Id* at 19.

With respect to the second factor to be considered, there appears to be limited extrinsic evidence of legislative intent one way or the other on the issue of a private cause of action with respect to the particular provisions at issue here, other than the language used. But the language used reflects a legislative intent that is in fact consistent with providing a private right of action because Congress specifically identified a discrete group and then used language giving that group a right to reimbursement. It is only logical to assume that if the group is denied the right granted to it by Congress, they will have a remedy.

In fact, one example of the difficulties caused by the rushed adoption of the FFCRA and the CARES Act will be discussed below – the failure of Congress to provide a reimbursement calculation method for any period where the provider did not publish their cash price on the website. This was the case at the Plaintiff for a period of time, and it was undoubtedly the case elsewhere as providers scrambled to line up staff, equipment, and supplies sufficient to safely and effectively address the pandemic. But the relevant CARES Act provisions are silent about what happens when no cash price is listed on the website.

Moreover, if there were no private right of action, patients and medical providers would be left remediless. The statute intended to prevent medical providers from directly billing the patients here, but that is apparently what Aetna wants. This is inappropriate. *Franklin v. Gwinnett County Pub. Schs.*, 503 U.S. 60, 76 (1992) (finding private right of

action for money damages under Title IX because administrative process would leave complainant "remediless").

In the face of the compelling arguments in favor of interpreting Part II, Subpart A, Section 3201 of the CARES Act as creating a private cause of action for out-of-network providers of COVID-19 related testing and services, Aetna contends that the Act contains no statutory language focused on protecting private rights. But this is simply inaccurate. As described above, the statutory provision at issue, 3201, protects the rights of out-of-network providers for reimbursement for rendered COVID testing services.

The law is clear that the existence of an alternative method of enforcement is not fatal to the existence of a private right of action. As the Second Circuit has explained, when concluding that an implied private right of action exists despite the presence of alternative enforcement avenues, "the provision of other (private or public) enforcement mechanisms (Bellikoff factors (i) and (ii)) merely "suggests" "that Congress intended to preclude" implied private rights of action." *Oxford Univ. Bank v. Lansuppe Feeder, LLC*, 933 F.3d 99, 106 (2d Cir. 2019) (citing *Alexander v. Sandoval*, 532 U.S. 275, 290).

Here, as in *Oxford Univ*. that "suggestion" is not particularly persuasive. The federal agencies are only empowered to fine Aetna for non-compliance. They are not empowered to protect the very specific right that the Plaintiff seeks to vindicate – their right to payment for services provided. Notably, Aetna does not make any suggestion that agency enforcement would alleviate the situation where a provider such as the Plaintiff stands to lose millions of dollars because they trusted the promise of the CARES Act that insurers "shall reimburse the provider" of COVID-19 testing services. As a result, closing the courthouse door to the Plaintiff, because a federal agency might take some undescribed enforcement action, would leave the Plaintiff uncompensated and in severe financial

distress, and is utterly inconsistent with the clear legislative intent of the statute. Despite diligent searching, Plaintiff could not find evidence of a single instance of DOL Enforcement of the testing provisions of the CARES Act.

Finally, Aetna cites cases rejecting attempts to privately enforce "various provisions" of the 300+ page CARES Act. However, these cases are all inapposite because not one of them addresses the specific provision of the CARES Act that the Plaintiff seeks to enforce in this case. As noted, the CARES Act is over 300 pages of legislation of which two pages are devoted to COVID-19 testing. The bulk of the Act addresses economic relief and stimulus programs. We do not contend that the CARES Act authorizes private actions to enforce all or even most of its provisions. None of the cases cited by Aetna remotely addresses the issue before the Court – whether Part II, Subpart A, Section 3201 of the CARES Act permits out-of- network providers to sue insurers to collect payments the Act entitles them to. Instead, the cases cited by Aetna concern payroll protection loans and other legislation to assist small businesses. *Am. Video Duplicating, Inc. v. City Nat'l Bank*, No. 20-cv-04036, 2020 WL 6882735, at *1 (C.D. Cal. Nov. 20, 2020) (concerns Paycheck Protection Program and the right of an agent to collect fees). None of the barriers these courts cited to recognition of a private right of action have any impact on the issues in this case.

**B. A PRIVATE RIGHT OF ACTION EXISTS UNDER THE CARES ACT**

This decision will probably be the most important that this Court will ever issue. Certainly none will ever affect as many people as this one may. It is not axiomatic or hyperbole to state that this decision may be read by the US Supreme Court.

There have been as of this moment in history only 2 cases addressing whether an out of-network provider can bring a private suit for nonpayment under the Federal CARES

Act. There is now a split in the jurisdictions. The rule is that a private right of action does not exist unless Congress grants it or it is implied by the nature of the legislation

The Texas District Court in ***Diagnostic Affiliates of Northeast Houston, LLC vs. United HealthCares Services,*** Jan 19, 2022, Civ Act found that a private right of action exists while in ***Murphy Med.Asso, LLC vs Cigna Health & Life Ins. Co*** 2022 U.S. Dist. LEXIS 43351, the Connecticut Court held that a private right of action did not exist because essentially it was not expressly stated by Congress. The Connecticut Court mentioned the Texas case but did not fully address it.

This Court's decision will be the tie breaker. This Court's will go to both the Texas and Connecticut Courts and be submitted as will to their full appellate courts when they rehear the issues en banc. From there, this court's decision may go to the US Supreme Court as part of the record.

The US Supreme Court in a case nearly identical issue of whether Congress imposed a liability and obligation to pay under the Patient Protection and Affordable Care Act and which was relied upon by the Texas court ***MAINE COMM. HEALTH v. US MOD. HEALTH PLAN, INC.*** 140.S.Ct. 1320, 1320 (2020) held:

> "Congress can also create an obligation directly by statute, without also providing details about how it must be satisfied. Consider, for example, *United States v. Langston,* 118 U.S. 389, 6 S.Ct. 1185, 30 S.Ct. 164 (1886). In that case, Congress had enacted a statute fixing an official's annual salary at "$7,500 from the date of the creation of his office."*Id.,*at 394, 6 S.Ct. 1185. Years later, however, Congress failed to appropriate enough funds to pay the full amount, prompting the officer to sue for the remainder. *Id.,* at 393, 6 S.Ct. 1185. Understanding that Congress had created the obligation by statute, this Court held that a subsequent failure to appropriate enough funds neither "abrogated [n]or suspended" the Government's pre-existing commitment to pay. *Id.,* at 394, 6 S.Ct. 1185. The Court thus affirmed judgment for the officer for the balance owed. *Ibid.*5 "

The Texas Court looked at this US Supreme Court case and concluded that Congress intended to impose the liability on insurance companies for payment to out of

network providers such as Plaintiff for their rendered Covid testing services. The issue was then to decide whether there was also an implied private right of action giving such out of network providers the ability to sue for nonpayment under the CARES Act.

To then make the decision as to whether a private right of action existed, the Texas Court then went on to apply the Supreme Court test as set forth in *Cort v Ash* 78 (1975) for determining whether a private right of action was implied:

> The Supreme Court identified four factors to consider in answering this question:
>
> "In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff 'one of the class for whose especial benefit the statute was enacted,'—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? *Cort v. Ash*, 422 U.S. 66, 78 (1975) (citations omitted).
>
> The Court later modified the rubric as follows:
>
> It is true that in *Cort v. Ash*, the Court set forth four factors that it considered "relevant" in determining whether a private remedy is implicit in a statute not expressly providing one. But the Court did not decide that each of these factors is entitled to equal weight. The central inquiry remains whether Congress intended to create, either expressly or by implication, a private cause of action. Indeed, the first three factors discussed in *Cort*—the language and focus of the statute, its legislative history, and its purpose—are ones traditionally relied upon in determining legislative intent.
>
> *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575–76 (1979) (citations omitted). This Court considers the four factors and weighs them consistent with *Touche Ross*. **Precedent**."

The Texas court in its *Diagnostic* decision applied the Supreme Court's test and concluded that a private right of action existed for an out of network provider so as to be able to sue to enforce the CARES Act. In comparison. the Connecticut court barely discussed the Supreme Court test and ruled instead on the basic premise that unless the Congress gives a private right of action it does not exist.

In opposition to the Texas court, the Connecticut court in Murphy Medical declined to find a private cause of action. Although this holding is contrary to the claim and position asserted by the Plaintiff and adopted by the court in Diagnostic Affiliates, we are bringing this opinion in Murphy Medical to your attention in recognition of the duty of candor and desire to inform the Court of potentially pertinent developments in this new area of the law.

Plaintiff respectfully submits that Murphy Medical decision is not persuasive for the following reasons:

1. The Murphy Medical decision does not address and analyze each of the four Cort factors, whereas the opinion in Diagnostic Affiliates, and GS Labs' briefing in this matter, explains why each and every one of the four Cort factors supports the existence of an implied private cause of action in CARES Act § 3202(a).

2. The court reasoned that plaintiff in Murphy Medical decision failed to identify "anything in the text or structure of the CARES Act which suggests that Congress intended to afford them with a privately enforceable remedy." By comparison, Plaintiff has identified in extensive detail why the text and structure of the CARES Act shows that Congress intended to provide a privately enforceable reimbursement remedy in favor of diagnostic testing providers.

3. Plaintiff in the Murphy Medical case argued primarily that "Congress's silence was merely a product of its rush to create legislation in the midst of the pandemic." Here, by contrast, Plaintiff has advanced numerous facts showing the text, purpose, legislative history, and historical Congressional action in this area of interstate concern all support finding a private cause of action. Indeed, in deciding Murphy Medical, the court appears

to have couched its holding by implying plaintiff in that case may have been able to successfully plead "factual allegations demonstrating that the FFCRA and CARES Act incorporate[s] a private right of action." That is exactly what Plaintiff has done in pleading its claim in this case.

4. The Murphy Medical court observed, without actually deciding, that the plaintiff testing provider before it may not be "remediless" because the Secretaries of Labor, Health and Human Services, and the Treasury suggested in FAQs, Part 43 that their Departments would enforce the FFCRA and CARES Act in conjunction with states. However, the mere suggestion that state or federal agencies might one day attempt to enforce CARES Act § 3202(a) of their own volition does not change the fact that Congress did not authorize them to do so, and that state and federal agencies have in fact not attempted to do so.

**CONCLUSION**

Based upon the foregoing, it should be found that an implied Congressional private right of actions exists under the CARES Act. This private right of action gives to all out of network providers who render Covid Testing Services, such as the Plaintiff, the ability to sue in their own right to redress of any violation of the CARES Act.

As such, this Court has both the authority to hear and the jurisdiction to decide any private action brought for any alleged violation of the Federal CARES Act.

` Respectfully submitted

Dated April 2 , 2022

Law Office of Michael Lynn Gabriel

/s/ Michael Lynn Gabriel
Attorney For Plaintiff